In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 24-2643 & 24-2644

BENJAMIN SCHOENTHAL, *et al.*,

*Plaintiffs-Appellees,*

*v.*

KWAME RAOUL, *et al.*,

*Defendants-Appellants.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:22-cv-50326 — **Iain D. Johnston**, *Judge.*

---

ARGUED MAY 28, 2025 — DECIDED SEPTEMBER 2, 2025

---

Before RIPPLE, ST. EVE, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Illinois's Firearm Concealed Carry Act forbids licensees from carrying firearms on public transportation, with an exception for unloaded and stored firearms. *See* 430 ILCS 66/65(a)(8). A violation is a misdemeanor punishable with up to six months incarceration for a first offense. The Plaintiffs argue that this restriction contravenes the Second Amendment. The district court agreed.

To assess the Plaintiffs' claim, we apply the test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and focus on whether 430 ILCS 66/65(a)(8) fits within our nation's "history and tradition" of firearm regulation. We conclude that the challenged law is comfortably situated in a centuries-old practice of limiting firearms in sensitive and crowded, confined places.

The Second Amendment protects an individual's right to self-defense. It does not bar the people's representatives from enacting laws—consistent with our nation's historical tradition of regulation—that ensure public transportation systems remain free from accessible firearms. We are asked whether the state may temporarily disarm its citizens as they travel in crowded and confined metal tubes unlike anything the Founders envisioned. We draw from the lessons of our nation's historical regulatory traditions and find no Second Amendment violation in such a regulation. We reverse.

## I. Background

### A. Illinois Law

The Firearm Concealed Carry Act allows Illinois residents to obtain licenses to carry concealed firearms in public.[1] 430

---

[1] Illinois law defines the "unlawful possession of weapons" as a criminal offense. *See* 720 ILCS 5/24-1; *see also* 720 ILCS 5/24-1.6 (the aggravated version of the offense). The Act was passed in 2013, after we determined that previous versions of 720 ILCS 5/24-1 & 5/24-1.6 that prohibited firearm possession in public violated the Second Amendment. See *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). Although the details are not pertinent to the issues on appeal, the Act more precisely allows carry of handguns, defined as "any device which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas that is designed to be held and fired by the use of a single hand." 430 ILCS

ILCS 66/1, *et seq*. It also enumerates locations where even licensees may not carry loaded and accessible firearms. 430 ILCS 66/65.

This case is about only one of those locations, public transit. The Act provides that a licensee shall not knowingly carry a firearm on or into

> [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds.

430 ILCS 66/65(a)(8). For convenience, we sometimes call this the "public transit firearm restriction," or Section 65(a)(8). Exceptions apply when a person carries a firearm that is broken down, properly stored, or not immediately accessible. 720 ILCS 5/24-1(a)(4)(i)–(iii).

A first violation of Section 65(a)(8) is a Class B misdemeanor punishable by up to 6 months incarceration and up to a $1,500 fine.[2] 430 ILCS 66/70(e) ("Except as otherwise provided, a licensee in violation of this Act shall be guilty of a Class B misdemeanor."); 730 ILCS 5/5-4.5-60.

Section 65(a)(8) regulates conduct on numerous public transit systems. The largest is the Chicago Transit Authority

---

66/5. It excludes machine guns, short-barreled rifles, and shotguns, and refers to the definitions of those terms found in 430 ILCS 5/24-1. *Id.*

[2] A subsequent violation is a Class A misdemeanor, punishable by up to 364 days incarceration and up to a $2,500 fine. 430 ILCS 66/70(e); 730 ILCS 5/5-4.5-55.

(CTA), which runs trains and buses in the city of Chicago and into surrounding communities. Hundreds of millions of CTA trips occur each year. The second largest is Metra, a commuter rail system again centered in Chicago. Additional forms of public transit include several more busing systems and two rail systems stretching into neighboring states, the South Shore Line (Indiana) and MetroLink (Missouri).

## B. Procedural History

The Plaintiffs are three Illinois residents who claim that Section 65(a)(8) violates their Second Amendment rights (as enforceable against Illinois by the Fourteenth Amendment).[3] Benjamin Schoenthal, Mark Wroblewski, and Douglas Winston are concealed carry licensees who want to carry firearms for self-defense while using public transit systems, namely the CTA and Metra. Plaintiffs often refrain from transit trips they want to take because Section 65(a)(8) requires temporary disarmament.

Plaintiffs brought their complaint against several state officials who they alleged are empowered to enforce Section 65(a)(8) against them: Illinois Attorney General Kwame Raoul, the Cook County State's Attorney (then Kimberly M. Foxx, now Eileen O'Neill Burke), and DuPage County State's Attorney Robert Berlin, plus two others who are no longer

---

[3] For most of this case, there has been a fourth plaintiff, Joseph Vesel. Shortly after oral argument, Vesel notified us that he became an officer with the University of Chicago Police Department. Under Illinois law, that position affords Vesel the right to carry a concealed firearm for personal protection when off-duty, including on public transportation. 110 ILCS 1020/1; 720 ILCS 5/24-2(a)(1); *id.* at 5/2-13. Thus, Vesel has accurately submitted that his claim regarding Section 65(a)(8) is moot. We dismiss him from this appeal.

subject to this proceeding, the DeKalb County and Lake County State's Attorneys.[4] They requested a declaration "that the Public Transportation Carry Ban consisting of 430 ILCS 66/65(a)(8), and all related laws, regulations, policies, and procedures" were unconstitutional.

The parties filed cross-motions for summary judgment. The district court's decision first addressed jurisdiction and rejected the argument that Plaintiffs lacked standing. It found an injury because "[t]he undisputed facts show that each plaintiff would carry a concealed handgun on public transportation for the purpose of self-defense if not for the Firearm Concealed Carry Act's ban and its threat of arrest and prosecution." Therefore, the district court concluded that "Plaintiffs' injuries trace back to the threat of enforcement" and "a declaration would redress that injury."

On the merits, after applying *Bruen*, the district court granted Plaintiffs' motion and declared that enforcing Section 65(a)(8) against Plaintiffs would violate the Second Amendment. It held that carrying firearms on public transit fell within the textual ambit of the Second Amendment, and that the government had failed to meet its burden to establish that Section 65(a)(8) was within the country's historical tradition of firearm regulation.

The Defendants appealed in two sets: Attorney General Raoul joined by the DuPage County State's Attorney, and the Cook County State's Attorney on her own. When the distinction matters, usually because an argument was made by only one, we refer to them separately as the State and Cook

---

[4] The district court dismissed these two defendants because Plaintiffs had not shown intent to ride public transit in DeKalb or Lake County.

County. When it does not, we speak of "Defendants" or simply "the government."

## II. Analysis

We review the district court's grant of summary judgment and the underlying question of constitutional law *de novo*. *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Before we reach the merits, we must confirm that Plaintiffs have standing to bring their claims. *Word Seed Church v. Vill. of Hazel Crest,* 111 F.4th 814, 819, 822 (7th Cir. 2024).

### A. Plaintiffs Have Standing

Article III of the Constitution affords federal courts with jurisdiction over "Cases" and "Controversies." *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). "A proper case or controversy exists only when at least one plaintiff 'establishes that she has standing to sue.'" *Id.* at 57 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

To establish standing, Plaintiffs must "present an injury that is [1] concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling." *Dep't of Commerce v. New York*, 588 U.S. 752, 766 (2019) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008)). As the district court found, each of the Plaintiffs would take a concealed firearm on public transportation if not for the credible threat of prosecution by Defendants under Section 65(a)(8), so injury and traceability are certain. And a judgment that the statute violates the Second Amendment would provide redress.

Cook County offers two reasons why we should neverthe-less conclude that the Plaintiffs lack standing. The first de-serves no more than a brief rejection. For context, Plaintiffs originally sought injunctive relief, in addition to a declaratory judgment, but the district court's summary judgment deci-sion held that they forfeited the request for an injunction.[5] Ac-cording to Cook County, the forfeiture means the district court lost jurisdiction to enter a declaratory judgment. That is incorrect.

Nearly a century of case law establishes that Plaintiffs can bring a standalone claim pursuant to the procedures in the Declaratory Judgment Act, 28 U.S.C. §2201(a), when the claim satisfies Article III's case-or-controversy requirement. *Nash-ville, Chattanooga & St. Louis Ry. Co. v. Wallace*, 288 U.S. 249, 262–63 (1933); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950) ("The Declaratory Judgment Act allowed relief to be given by way of recognizing the plaintiff's right even though no immediate enforcement of it was asked."); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) ("There was a time when this Court harbored doubts about the compatibility of declaratory-judgment actions with Arti-cle III's case-or-controversy requirement. … We dispelled those doubts…."). Cook County misreads *California v. Texas*, which again explains the uncontroversial proposition that a plaintiff who seeks a declaratory judgment must show stand-ing like any other plaintiff, including that the asserted injury can be relieved by court action such as an injunction. 593 U.S. 659, 672 (2021). Contrary to Cook County's position, a

---

[5] Plaintiffs did not cross-appeal this ruling.

plaintiff need not actually pursue that relief.[6] *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241 (1937) ("And as it is not essential to the exercise of the judicial power [to enter a declaratory judgment] that an injunction be sought, allegations that irreparable injury is threatened are not required."); *see also Hero v. Lake County Election Board*, 42 F.4th 768, 772 (7th Cir. 2022).

That brings us to Cook County's second reason why Plaintiffs lack standing: other rules restrict Plaintiffs from carrying firearms on public transportation even in the absence of the challenged statute, so a favorable decision does not redress Plaintiffs' injuries because they still could not carry firearms on public transit. This argument requires us to carefully parse the Supreme Court's standing jurisprudence, along with our own case law, but Plaintiffs' injuries are indeed redressable.

Currently, Metra bans firearms with no exception for concealed carry licensees. Passenger Code of Conduct, Metra, §§III(I), IV(H).[7] Plaintiffs assert that they will defy Metra's

---

[6] In *California v. Texas,* the plaintiffs requested a declaratory judgment that an "unenforceable statutory provision"—the Affordable Care Act's zeroed-out monetary penalty for individuals without health insurance—was unconstitutional. 593 U.S. at 673. Because the plaintiffs had no damages from the penalty and could not obtain an injunction to prevent any official from enforcing the penalty of zero dollars, the Supreme Court held that plaintiffs sought an advisory opinion that could not have provided relief from the purported injury. *Id.*

[7] Cook County also says that CTA has a similar ban, but we put that issue to the side because all three Plaintiffs desire to ride Metra while armed, but only one has the same wish for CTA. With respect to CTA, the premise of Cook County's argument may well be wrong. CTA Ord. No. 016-110 §1(28) (2016) bans firearms but exempts individuals "authorized under Section 5/24-2 of the Illinois Criminal Code to carry weapons onto

rule if Section 65(a)(8) is declared unconstitutional. Cook County retorts that if Plaintiffs knowingly ride Metra in violation of the firearm ban, they face prosecution for trespass, which is also a Class B misdemeanor. *See* 720 ILCS 5/21-3 (providing that a person commits criminal trespass when he enters upon land after receiving notice that the entry is forbidden).

Cook County cites *Harp Advertising Illinois, Inc. v. Village of Chicago Ridge* to argue that Metra rules and the possibility of trespass charges eliminate Plaintiffs' standing. 9 F.3d 1290 (7th Cir. 1993). There, we held that a plaintiff who challenged one village ordinance lacked standing because the desired conduct was prohibited by another unchallenged and unrelated zoning rule, hence a favorable ruling would not redress the injury. *Id.* at 1292.

transit…." A look at Section 5/24-2 of the Illinois Criminal Code reveals that it does not "authorize" any individual to carry weapons on transit, at least not in plain terms. Instead, it lists "exceptions" from Section 24-1, which defines the offense of "unlawful possession of weapons" in a manner that includes carrying firearms on transit. *See* 720 ILCS 5/24-1, 24-2. It appears that the best reading of the CTA ordinance's text is that because one of the exceptions in Section 5/24-2 applies to individuals with a concealed carry license, *see* 720 ILCS 5/24-2(a-5), Plaintiffs are "authorized" to "carry weapons onto transit" and the ordinance does not apply to them. Therefore, Section 65(a)(8) would be the only restriction on CTA riders who have a concealed carry license, and Plaintiff Douglas Winston would have standing regardless of anything else we say. We called for supplemental briefing on this issue, but given the complex interplay between the CTA ordinance and the relevant Illinois statutes, and that all three Plaintiffs have standing either way, we refrain from reaching a definitive conclusion. Federalism concerns counsel us to leave novel and complex interpretations of Illinois law to Illinois's courts, unless we must confront such an issue to render a decision.

Cook County also invokes *Haaland v. Brackeen*, where the Supreme Court held that the plaintiffs lacked standing because while a federal court decision might have had powerful persuasive effect, it would not bind the state courts who implemented the challenged statute. 599 U.S. 255, 292–94 (2023). "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Id.* at 294 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment) (emphasis in original)). "It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." *Id.* Cook County thus contends that even if a federal court decision striking down Section 65(a)(8) would be convincing to future (federal or state) courts considering a pre-enforcement challenge to Metra's rules, or to state courts encountering a trespass prosecution based on the violation of those rules, it would not suffice to remedy Plaintiffs' injury.

Here, Plaintiffs' redressable injury is facing prosecution under Section 65(a)(8).[8] With respect to possible trespass charges, neither we nor the Supreme Court have ever held that a plaintiff who brings a pre-enforcement challenge against one criminal statute must also challenge all criminal or civil enforcement statutes that potentially bear upon the same conduct. "[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v.*

---

[8] To be precise, prosecution under 430 ILCS 66/70(e) for violating Section 65(a)(8).

*Preczewski*, 592 U.S. 279, 291 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

In *Reporters Committee for Freedom of the Press v. Rokita*, we affirmed the grant of a preliminary injunction in a pre-enforcement challenge to Indiana's buffer law, which made it a crime to approach within 25 feet of a law enforcement officer executing his duties. No. 24-2927, 2025 WL 2218472, at *1 (7th Cir. Aug. 5, 2025). There, we rejected a similar argument that the plaintiffs lacked a redressable injury where the challenged buffer law and a separate, unchallenged emergency incident statute each criminalized similar conduct. *Id.* at *4–5. First, we explained that "although there may be some overlap between the buffer law and the emergency incident statute, the overlap is not complete"—the buffer law "applie[d] in a far broader set of situations…." *Id.* at *4. Second, we observed that even had there been complete overlap, because both statutes were criminal laws, facing prosecution under both for the same conduct would subject the plaintiffs to steeper penalties. *Id.* We held that "removing an additional layer of criminal liability [is] a form of redress sufficient to confer standing, even though the underlying behavior [is] still subject to prosecution" under other laws. *Id.* (citing *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024)).

Contrary to Cook County's arguments, *Harp* does not undercut our standing analysis. There, we discussed standing where the asserted injury was "the inability to erect an off-premises billboard" and the overlapping restrictions were imposed by civil, not criminal laws—a zoning rule challenged by the plaintiff and a separate, unchallenged local ordinance. *Harp*, 9 F.3d at 1292. Either of the zoning rule or the ordinance operating alone would have precluded the *Harp* plaintiff's

desired conduct; the layers of criminal liability central to *Reporters Committee for Freedom of the Press* were not present. *Id.* Cook County points out that *Harp* relied on *Renne v. Geary*, but that case is even further afield from the facts here. 501 U.S. 312 (1991). In *Renne*, the plaintiffs challenged a restriction on certain speech from political candidates, alleging injury because "they desired to hear" that speech. *Id.* at 319. The Supreme Court had "reason to doubt" that this injury could be redressed by a favorable decision because a different, unchallenged law might still prohibit the speech that the plaintiffs wanted to hear. *Id.* Quite unlike this case, the asserted injury was a step removed from the restriction, which had no direct effect on the plaintiffs. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."). Also relevant for our purposes is that the challenged rule "carrie[d] no criminal penalties, and [could] only be enforced by injunction." *Renne*, 501 U.S. at 322.

We decline to extend *Harp* to defeat Plaintiffs' standing here and instead follow *Reporters Committee for Freedom of the Press*. Plaintiffs' criminal exposure from Section 65(a)(8) is a discrete injury that a court can remedy. "Plaintiffs [who] face a credible threat of prosecution ... should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010) (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)). A categorical rule that plaintiffs must always challenge all restrictions that might apply to their desired conduct could allow the government to evade review of squarely presented controversies, especially in the realm of pre-enforcement challenges to criminal penalties. At the same time, we

recognize that overlapping criminal statutes could defeat standing in other contexts, and note the need for careful consideration when these concerns arise.

As stated by *Brackeen*, 599 U.S. at 292–94, the possible impact of a favorable *opinion* could not give Plaintiffs' standing if they had not presented Section 65(a)(8) charges as an injury that a favorable *judgment* is likely to redress.[9] It merely helps define the injury. In viewing the injury as prosecution under Section 65(a)(8), we find it relevant that there are several layers of conjecture needed to conclude that Plaintiffs would continue to face trespass charges after a favorable decision. Without Section 65(a)(8), no portion of the Illinois Criminal Code prohibits Plaintiffs from carrying concealed firearms on transit.[10]

We also observe that Metra has authority to confiscate fare media and suspend riding privileges but cannot otherwise penalize Plaintiffs. Passenger Code of Conduct, Metra, §V. Plaintiffs' apparent cost-benefit analysis—that they would

---

[9] As the concurrence discusses, we must also consider issue preclusion. However, we decline to ground our jurisdiction upon a broader analysis of the preclusive effect our judgement would have on future state or federal lawsuits. *Brackeen* involved a lawsuit against federal officials, when state officials enforced the law at issue. 599 U.S. at 293 (explaining the state officials would "not be bound by the judgment"). Here, a judgment favorable to Plaintiffs would bar the named Defendants from enforcing Section 65(a)(8) and related laws and regulations (as we discuss next).

[10] CTA's amicus brief argues that 430 ILCS 66/65(a)(5), which bars firearms in "[a]ny building or portion of a building under the control of a unit of local government," is an independent bar to redressability. Although Plaintiffs have not specifically cited this portion of the statute in pressing their claims, it is identical to Section 65(a)(8) with respect to the proposed conduct, and we consider the two provisions together.

risk sanction under these rules but not charges under Section 65(a)(8)—is conceivably rational. The prospect of these considerably lower penalties does not defeat redressability.[11]

There is a second basis for our conclusion that Plaintiffs have standing.[12] In a decision issued at the end of the last term, the Supreme Court emphasized that we assess redressability based on the plaintiff's complaint, not "the relief the District Court granted on the merits." *Gutierrez v. Saenz*, 145 S. Ct. 2258, 2267 (2025). There, the Supreme Court said that

---

[11] Metra operates on privately owned railroad lines, including the BNSF Railway, the Canadian National Railway, and the Union Pacific Railroad. *See, e.g., Union Pac. R. Co. v. Reg'l Transp. Auth.*, 74 F.4th 884, 885 (7th Cir. 2023) (describing the relationship between Metra and Union Pacific). Cook County asserts that these entities all prohibit firearms on their property, and that this restriction is another independent rule barring redress for Plaintiffs. We are not moved. Cook County backs this claim with rules pertaining to railway employees and contractors, leaving unclear if the railways apply them to passengers. And assuming the rules do govern Metra passengers, we reject Cook County's argument for the same reasons as for Metra's Code of Conduct.

[12] Plaintiffs, who have the burden to establish standing, only raised this argument after we requested supplemental briefing. Yet we have an "independent obligation" to assess standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). While "'[a] court's non-waivable obligation to inquire into its own jurisdiction is most frequently exercised in the negative,' courts 'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not....'" *In re Financial Oversight and Management Board for Puerto Rico*, 110 F.4th 295, 314 (1st Cir. 2024) (quoting *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3rd Cir. 2016)). It is therefore "appropriate to consider arguments favoring standing not presented" by the Plaintiffs in their appellate brief, *id.*, particularly when Plaintiffs mounted other vigorous arguments for standing, introduced supporting evidence in the summary judgment record, and an interceding Supreme Court decision affected the analysis.

"[t]o the extent the Fifth Circuit based its assessment of re-dressability on the declaratory judgment the District Court later issued, rather than Gutierrez's complaint, it turned the Article III standing inquiry on its head." *Id.*

Here, the complaint's prayer for relief requested a judgment declaring that the "Public Transportation Carry Ban consisting of 430 ILCS 66/65(a)(8), and *all related laws, regulations, policies, and procedures*" violates the Second Amendment (emphasis added). Metra's rules are not formally connected to Section 65(a)(8), but a trespass prosecution for violating those rules is properly characterized as a "related" regulation on carrying firearms. Based on the prayer for relief and the nature of the Plaintiffs' claim, the litigation could have developed such that the district court declared that Plaintiffs had a right to travel on public transit while armed, and that any effort to impede that right with criminal charges is unconstitutional. The district court's order was more circumspect, referencing only Section 65(a)(8). But even if we agreed with Cook County and found that the district court's decision did not actually redress Plaintiffs' injury, the fact that the district court *could have* redressed the injury is sufficient to confer standing in the first place. *Gutierrez*, 145 S. Ct. at 2267.

With our jurisdiction assured, we turn to the merits.

### B. Illinois's Public Transit Firearm Restriction Is Consistent With The Second Amendment

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Seventeen years ago, the Supreme Court interpreted this language in recognizing an individual right to possess and carry weapons.

*District of Columbia v. Heller*, 554 U.S. 570 (2008). Not long af-
ter, the Court held that the Fourteenth Amendment incorpo-
rated that Second Amendment right against the states.
*McDonald v. City of Chicago*, 561 U.S. 742 (2010). These deci-
sions "opened up new frontiers of litigation" and gave rise to
uncertainty about the appropriate framework for deciding
whether a firearm regulation was constitutionally permissi-
ble. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188–92 (7th Cir.
2023) (tracing the development of Second Amendment juris-
prudence after *Heller*).

The Supreme Court has now instructed us to assess Sec-
ond Amendment claims by using the two-step test laid out in
*Bruen*, 597 U.S. at 24, with the benefit of the additional direc-
tion in *United States v. Rahimi*, 602 U.S. 680 (2024). Under the
*Bruen* framework, we first consider whether "the Second
Amendment's plain text covers an individual's conduct...."
*Bruen*, 597 U.S. at 24. At this first step, we corroborate our
reading of the Second Amendment's plain text with assistance
from historical sources. *See id.* at 20 (explaining that in *Heller*,
the Court assessed whether its initial textual interpretation
was "confirmed by the historical background of the Second
Amendment" (quoting *Heller*, 554 U.S. at 592)). If the plain
text covers an individual's conduct, "the Constitution pre-
sumptively protects that conduct." *Id.* And we then move to
*Bruen's* second step, where the government has the burden to
"justify its regulation by demonstrating that it is consistent
with the Nation's historical tradition of firearm regulation."
*Id.*

Everyone agrees that the plain text of the Second Amend-
ment, as interpreted by the Supreme Court, covers Plaintiffs'
desire to ride public transit while carrying a licensed

concealed firearm for self-defense. *See id.* at 29 (quoting *McDonald*, 561 U.S. at 767) ("[I]ndividual self-defense is 'the *central component*' of the Second Amendment right."). There is no need to linger on the first step.

At the second step, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. To determine whether a modern regulation is "'relevantly similar' to laws that our tradition is understood to permit," *id.* (quoting *Bruen,* 597 U.S. at 29), the central inquiry is "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense," *Bruen,* 597 U.S. at 29. For how, we ask "whether modern and historical regulations impose a comparable burden on the right of armed self-defense...." *Bruen,* 597 U.S. at 29. Then, for why, "whether that burden is comparably justified...." *Id.* A law that "regulates arms-bearing for a permissible reason" may still fall to a Second Amendment challenge if the burden exceeds that found in our tradition. *Rahimi*, 602 U.S. at 692. But when the government has presented "historical laws 'address[ing] particular problems' there is a good chance 'contemporary laws imposing similar restrictions for similar reasons' are also permissible." *United States v. Rush*, 130 F.4th 633, 641 (7th Cir. 2025) (quoting *Rahimi*, 602 U.S. at 692).

In the words of the Supreme Court, "recent Second Amendment cases ... were not meant to suggest a law trapped in amber." *Rahimi*, 602 U.S. at 691. "Even if the modern-day regulation is not 'a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster'—we need not find a historical 'twin.'" *Rush*, 130 F.4th at 641 (quoting *Bruen,* 597 U.S. at 30). After all, "[t]he regulatory

challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. The *Bruen* inquiry accordingly recognizes that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to drawing historical analogies. *Id.*

With that foundation, we confront Illinois's public transit firearm restriction. Undoubtedly, some place-based restrictions on carrying firearms are harmonious with the Second Amendment. The Supreme Court has provided a non-exhaustive list of "sensitive places" to use as material for analogical reasoning, and beyond that, there is a more expansive tradition of regulations pertaining to confined and crowded places. *Id.* at 30. Although public transportation is a historically recent phenomenon, the regulation at issue is "relevantly similar" to rules throughout our nation's history. *Id.* at 29. We conclude that the government has met its burden under step two.

   1. *Regulation of Firearms in Sensitive Places is Permissible*
The Supreme Court has repeatedly recognized that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are consistent with the Second Amendment. *Heller*, 554 U.S. at 626–27; *McDonald*, 561 U.S. at 786. Sensitive places "where weapons were altogether prohibited" in the 18th and 19th centuries also include "legislative assemblies, polling places, and courthouses...." *Bruen*, 597 U.S. at 30. At the time, there was no dispute that these rules were legal. *Id.* Thus, "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new*

and analogous sensitive places are constitutionally permissible." *Id.*

The Second and Ninth Circuits recently applied the sensitive places doctrine. The Second Circuit largely rejected a Second Amendment challenge to a New York state law that criminalized carrying firearms in many places, including parks, bars, places of worship, theaters, zoos, and more. *Antonyuk v. James*, 120 F.4th 941, 955–57 (2d Cir. 2024).[13] It did not assess the constitutionality of a public transit restriction.[14]

The Ninth Circuit reached a more mixed result after reviewing California and Hawaii laws that again restricted firearms in parks, bars, places of worship, plus other locations not covered by New York's law, like banks and hospitals. *Wolford v. Lopez*, 116 F.4th 959, 1002–03 (9th Cir. 2024) ("A State likely may ban firearms in museums but not churches; in restaurants but not hospitals; in libraries but not banks.").

Critically, the Ninth Circuit also assessed California's prohibition of firearms on public transit. *Id.* at 1000. Our sister circuit held that the law was likely unconstitutional but only because it did not contain an exception for unloaded and

---

[13] The Supreme Court denied certiorari. *Antonyuk v. James*, 145 S. Ct. 1900 (2025).

[14] The district court enjoined New York's ban on carrying firearms in buses, vans, and airports (to the extent a person was "complying with all federal regulations there"). *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 331 (N.D.N.Y. 2022). New York did not appeal that part of the decision. *See Antonyuk*, 120 F.4th at 960. ("The State challenged each aspect of the injunction except for the portion concerning the [New York ban's] application to buses and airports.").

secured firearms.[15] *Id.* at 1000–01. Illinois, of course, has that exception. We will say more about *Wolford*'s public transit analysis later.

Right now, we advise that while the issue before us is narrower than those in *Antonyuk* or *Wolford*, we find their reasoning instructive. After reviewing *Bruen* and *Rahimi* with the insight of our sister circuits, we apply the following methodology to analyze a place-based firearm restriction. "Our Nation has a clear historical tradition of banning firearms at sensitive places." *Wolford*, 116 F.4th at 980; *Bruen*, 597 U.S. at 30 (same). To show that a place-based regulation fits within that tradition, the government may compare it to the regulations on schools, legislative assemblies, polling places, and courthouses blessed in *Heller* and *Bruen.* Comparison to regulations at those four sensitive places benefits from an already-completed historical analysis. All we must do is make the analogy. But nothing in *Bruen* suggests that its short list of sensitive places was intended to be a conclusive survey of all historical place-based firearm laws. Such a narrow reading would run contrary to the two-part test *Bruen* announced. When a modern law does not neatly compare to the regulations on the four prototypical sensitive places, as it often might not, the government should present additional historical evidence of analogous place-based restrictions to help locate the challenged law within our tradition. If the government cannot do so, a modern regulation is unconstitutional.

---

[15] *Antonyuk* and *Wolford* were both appeals from a preliminary injunction rather than a declaratory judgment. This procedural distinction with our case is immaterial to the legal analysis.

One point deserves emphasis. We are in the project of comparing regulations, not places. *Bruen*, 597 U.S. at 29–30; *Rahimi*, 602 U.S. at 692. "'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

That matters because the sensitive places identified in *Bruen* meaningfully differ from one another in their characteristics. We must consider whether there are core principles unifying those sensitive places that justify firearms regulations within them. Schools and courthouses may share structural characteristics (or not), and certainly differ in their functions and the ages and activities of their primary inhabitants; legislative assemblies and polling places are central to representative democracy but share few characteristics as physical spaces.

Plaintiffs attempt to carve out schools from the group and then assert that the remaining commonality is that the government provides comprehensive security in those places. This effort does not withstand historical scrutiny. Plaintiffs assert that firearm restrictions in schools were linked to the principle of *in loco parentis* authority over students. But it would be odd for the Supreme Court to talk about schools in the context of sensitive places if it was actually referring to restrictions on students, a subset of those occupying the place. Because we read *Bruen,* 597 U.S. at 30, and *Heller*, 554 U.S. at 626, to say that schools are places where firearms can be prohibited for all individuals, what makes schools "sensitive" must be something other than *in loco parentis*. Surely, it is not government provided security.

The security principle also cannot unify even legislative assemblies, polling places, and courthouses. Nowadays, we expect to be greeted at legislative assemblies and courthouses with screenings and armed officials. But the historical evidence marshaled by the parties and amici indicates surprisingly lax and irregular security practices in our nation's past. Legislative assemblies, including Congress, were often protected by merely one person, whose duties and abilities would be less-than-adequate to stave off violence.[16] Courthouses, relatedly, preoccupied sheriffs with administrative responsibilities, and would not always require their regular attendance.[17] And the historical evidence of law enforcement

---

[16] *See* THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 426–27 (John Faucheraud Grimke ed., Phila., R. Aitken & Son 1790), Act of Mar. 27, 1787, No. 1482 (South Carolina statute providing for one door-keeper for each legislative chamber); A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA 372–73 (Augustin Smith Clayton ed., Augusta, Adams & Duyckinck 1812), Act of Dec. 10, 1807, No. 280 (Georgia statute paying one individual for dual role of "messenger and door-keeper" for each chamber); EXTRACTS FROM THE JOURNAL OF PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 240 (Burlington, Isaac Collins, reprinted by Woodbury, Joseph Sailer 1835), Act Effective Mar. 1, 1776 (New Jersey ordinance providing for payment to one legislative door-keeper); United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission [https://perma.cc/94HJ-SUFF] (last visited Aug. 11, 2025) (explaining that in 1800 a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four).

[17] Founding-era state laws required the sheriffs' and constables' presence in courthouses at times but also obliged their presence in the broader community for the service of writs, warrants, and summonses, punishing crimes, and overseeing the sale of property. That array of functions supports our conclusion that the Founding-era sheriff's remit was broader than that of the modern courthouse security guard. *See* THE PUBLIC LAWS

at polling places persuades us that their role was largely to help run elections rather than provide security.[18] In all three contexts, law enforcement ensured smooth operations, which is distinct from the practice of comprehensive security to keep people safe.

The government, in contrast to Plaintiffs, does not attempt to devise a common factor between schools, legislative assemblies, polling places, and courthouses. In lieu of that effort, the government's analogies pick out various characteristics shared by some of those places. As discussed below, many of those comparisons are well-made, but we still need to identify a core principle underlying sensitive place regulations.

That unifying principle emerges when we look at "how" and "why" the government historically burdened the right to carry weapons in these four types of sensitive places.

---

OF THE STATE OF RHODE-ISLAND 220, 222 (Providence, Carter & Wilkinson 1798), Act of Jan. 29, 1798; LAWS OF THE STATE OF NEW JERSEY 50 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811), Act of Mar. 15, 1798; A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 473–74 (Robert & George Watkins eds., Phila., R. Aitken 1800), Act of Dec. 18, 1792; 1 THE LAWS OF MARYLAND, ch. 25 (1799).

[18] *See* THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 387–88, Act of Mar. 27, 1787, No. 1395 (including in the "public services of the Sheriff" the administrative functions of "publishing writs for electing members to the General Assembly" and "taking the ballots and returning the writ"); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed., 1796), Act of Dec. 11, 1778 (requiring the sheriff to notify the freeholders of the upcoming election and to "attend and take the poll at such election, entering the names of the persons voted for in a distinct column, and the name of every freeholder giving his vote under the name of the person he votes for," and to "upon oath, certify[] the name of the person elected, to be by the clerk recorded.").

*See Rahimi,* 602 U.S. at 692. Ironically, the similarity is their differences; not with each other, but from everywhere else. They are all discrete places with unavoidable characteristics that potentially render it ill-advised to allow firearms. Schools are learning environments overwhelmingly dominated by the presence of children; legislative assemblies feature public officials making weighty decisions about how to run our government. Polling places call upon the public to do the same. So do courthouses oblige judges and juries with the administration of justice. What happens within these places means that there is a pre-existing vulnerability or societal tension that would be exacerbated by the presence of firearms. And crucially, they are a list of dispersed places within a community, not the community itself, so regulation deprives the Second Amendment right only for a limited time.

Put another way, firearms are potentially disruptive and deadly everywhere. The Second Amendment settled whether society nevertheless accepts the risk of allowing armed self-defense. Yet the sensitive places doctrine tells us that the appropriate balance allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past.

"To be clear," this is not a "regulatory blank check" to use security fears to justify any firearm restriction. *Bruen*, 597 U.S. at 30. Rather, the search for a "relevantly similar" regulation burdens the government to make comparisons between the "particular problems" that motivated historical firearm restrictions in certain places and the problems that spur restrictions today. *Rahimi,* 602 U.S. at 692. Here, logical reasoning builds on the foundation of history.

What is said when making an analogy to historical sensitive place rules might at times sounds like the means-end scrutiny rejected in *Bruen*, 597 U.S. at 19. But the fact that similar points can be made under different tests is a familiar aspect of the law. A prosecutor cannot secure a conviction by arguing that a defendant is so dangerous that he deserves to be behind bars. She can do so only by proving the elements of an offense. That those elements might go heavily to a defendant's danger does not change the nature of the appropriate inquiry. The same is true under *Bruen*. The Founding generation made policy choices, inhered with value-laden judgments, and so have successive generations. We cannot analogize without reference to those choices.

Still, *Bruen* assigns judges with the part-time role of historian, not policymaker. The government certainly should not try to convince us that a law's benefits outweigh the costs. It should show no more, and no less, than that the trade-off is one that accords with our history.

Some place-based restrictions will look much like those in the past. (Think of a rule banning firearms at a daycare.) Other times, they will appear rather different. This may be a constitutional warning sign, especially if the government is restricting firearms in a place that has existed throughout our nation's history without analogous prohibitions. *See, e.g.*, *Wolford*, 116 F.4th at 980–81. It may also reflect the fact, however, that some places did not exist until more recent periods of history. "[C]ourts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Antonyuk*, 120 F.4th at 970. When modern issues are significantly different from problems encountered in

the past, higher-level analogies can support a law's constitutionality. *Bruen*, 597 U.S. at 27.

All in all, the Supreme Court's *Bruen* framework, and the sensitive place doctrine, lead us to ask: Is Illinois's law "'relevantly similar' to laws that our tradition is understood to permit....?" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). We could likely answer in the affirmative. Nevertheless, our Constitutional rights stand as a bulwark against government overreach, and we do not treat Second Amendment rights as a "second-class right…." *Bruen*, 597 U.S. at 70. So before concluding that Illinois may temporarily cabin an individual's right to carry a firearm while using a crowded transit system, we continue our analysis.

> 2. *Illinois's Public Transit Firearm Restriction is Akin to the Tradition of Regulating Firearms in Crowded and Confined Spaces*

We start by expanding on *Bruen*'s list of locations where firearms were historically prohibited. In response to Plaintiffs' challenge, the government fits the public transit restriction within the sensitive places doctrine by supplying evidence that a consistent historical thread prohibits firearms in analogously crowded and confined locations. After that regulatory practice started in medieval England, it continued in Revolutionary America, through Reconstruction, and into the present day. Our sister circuits have described much of this history. *Wolford*, 116 F.4th at 986; *Antonyuk*, 120 F.4th at 1019–24. We borrow from their telling.

The beginning of the relevant tradition, based on the record the government has provided, is 1328's Statute of Northampton, a "British statute forbidding going or riding 'armed by night [ ]or by day, in fairs [or] markets....'" *Antonyuk*, 120

F.4th at 1019 (quoting Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.)). This firearm restriction in traditionally crowded public spaces persisted into American law, including in Virginia and North Carolina. 1786 Va. Acts 35, ch. 49; *State v. Huntly*, 25 N.C. 418, 420–21 (1843).

Plaintiffs explain, and we accept, that these laws were understood to only prohibit firearm carrying that caused "terror."[19] *See Bruen*, 597 U.S. at 40–45 (discussing the Northampton statute and successor laws). That weakens the analogy. Nevertheless, the laws still demonstrate that the American tradition has long approved of firearm restrictions that are triggered by carrying in a crowded space, even if another condition is required to complete the violation.[20] This is a principle, rather than a dead ringer. *Rahimi*, 602 U.S. at 692.

Another law built on the principle that originated in the Statute of Northampton by flatly banning carrying firearms

---

[19] The Second Circuit concluded that North Carolina law did not have a terror element, but Plaintiffs argue that the Second Circuit relied on an inaccurate historical document. *Antonyuk,* 116 F.4th at 1019–20. One peril of relying on history is that records of past laws are incomplete and can be unreliable. For the purpose of this opinion, we assume that Plaintiffs are right, but we would not see this as a load-bearing mistake in the Second Circuit's analysis.

[20] We agree with the Second Circuit that *Bruen* addressed the Statute of Northampton as a justification for New York's categorical restriction on public carry and that the Supreme Court's analysis in that regard does not control whether the Northampton statute is analogous to more limited place-based restrictions. *Antonyuk*, 120 F.4th at 1020 n.82; s*ee also Rahimi*, 602 U.S. at 700 ("The conclusion that focused regulations ... are not a historical analogue for a broad prohibitory regime like New York's [in *Bruen*] does not mean that they cannot be an appropriate analogue for a narrow one.").

in confined and crowded spaces, without any terror require-
ments. An 1817 New Orleans ordinance prohibited firearms
in public ballrooms. *See* An Ordinance Respecting Public Balls
(1817), *in* A GENERAL DIGEST OF THE ORDINANCES AND
RESOLUTIONS OF THE CORPORATION OF NEW ORLEANS 371
(1831); *Wolford*, 116 F.4th at 986. We see no sign that the law-
fulness of this rule, which was enacted within the lifetimes of
the generation that fought the Revolutionary War and ratified
the Bill of Rights, was subject to dispute. *Bruen*, 597 U.S. at 30
(advising that a key concern is to avoid upholding laws that
"our ancestors would have never accepted") (quoting *Drum-
mond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

And, as discussed, sensitive place restrictions were al-
ready well-known. The idea that firearms could be banned in
certain locations, which originated in British legal practices,
provided a relevant principle familiar to the Founding gener-
ation, and helps us understand why restrictions such as the
New Orleans ordinance would be accepted without contro-
versy. These rules were evolving and building on each other
as a young nation put into practice the public understanding
of the right to bear arms.

Before moving on, we pause for another comment on
methodology. Plaintiffs argue that much of the government's
other evidence is not probative because it is after the Found-
ing era. We are unconvinced. "[T]he government is not con-
strained to only Founding Era laws. While not every time pe-
riod is weighed equally, *Bruen* instructs us to consider 'histor-
ical precedent from before, during, and even after the found-
ing....'" *Rush*, 130 F.4th at 642 (quoting *Bruen*, 597 U.S. at 27).
That approach accords with Founding-era methodologies of
constitutional and statutory interpretation. *See, e.g.*, THE

FEDERALIST NO. 37 (James Madison) (1788) ("All new laws…
are considered as more or less obscure and equivocal, until
their meaning be liquidated and ascertained by a series of par-
ticular discussions and adjudications.").

Although the Supreme Court has not set a conclusive cut-
off point, we and other circuits concur that evidence stretch-
ing into the nineteenth century is useful to a *Bruen* inquiry.
*Rush,* 130 F.4th at 642 (citing to an 1856 statute); *Bevis*, 85 F.4th
at 1201–02; *Antonyuk*, 120 F.4th at 973–74; *Wolford*, 116 F.4th at
980; *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1121 (11th Cir.
2025) (en banc) (W. Pryor, C.J.) (relying on "[m]id-to-late-
nineteenth-century laws"). That is especially true when re-
viewing a state law, given that the states were not bound by
the Second Amendment until the Fourteenth Amendment
was ratified in 1868. *See Antonyuk*, 120 F.4th at 972–74; *Wolford*,
116 F.4th at 980.

A trickier issue emerges when Founding-era evidence and
laws from later periods, such as Reconstruction, provide op-
posite signals about the contours of the Second Amendment.
"But we need not and do not decide in this appeal how to ad-
dress a conflict between the Founding-era and Reconstruc-
tion-era understandings of the right...." *Nat'l Rifle Ass'n*, 133
F.4th at 1116–17. When it comes to crowded space restrictions,
"historical practice from the mid-to-late nineteenth century …
confirm[s] the Founding-era understanding of the Second
Amendment." *Id.* at 1116.

For example, an 1852 New Mexico law prohibited firearms
at any "Ball or Fandango" (as the combined reference

conveys, a fandango is a social gathering like a ball).[21] *Wolford*, 116 F.4th at 986 & n.5; *see* 1852 N.M. Laws 67, 69, §3. In the Reconstruction Era, at least four states "passed laws prohibiting weapons in ... crowded places such as assemblies for 'educational, literary or scientific purposes, or ... ball room[s], social part[ies,] or other social gathering[s].'" *Antonyuk*, 120 F.4th at 1020 (quoting 1870 Tex. Gen. Laws 63, ch. 46, §1); *see also* 1870 Ga. Laws 421, No. 285, §1; 1875 Mo. Laws 50–51, §1; 1869–1870 Tenn. Pub. Acts 23–24, ch. 22, §2; 1871 Tex. Gen. Laws 25–26, ch. 34, §3 (adding additional restricted areas to 1870 law)); *Wolford*, 116 F.4th at 986–88 (discussing these laws).

These crowded-space restrictions were consistently upheld as constitutional under state constitutional provisions analogous to the Second Amendment. *Andrews v. State*, 50 Tenn. 165, 186 (1871); *English v. State*, 35 Tex. 473, 480 (1871);[22] *Hill v. State*, 53 Ga. 472, 476 (1874); *State v. Shelby*, 2 S.W. 468, 469–70 (Mo. 1886). That is strong evidence that similar crowded space rules are constitutional today. *See Bruen*, 597 U.S. at 68 (describing "judicial scrutiny" as relevant to the analysis); *Wolford*, 116 F.4th at 981 ("[I]f courts unanimously

---

[21] New Mexico was still a territory, but while *Bruen* found several short-lived territorial restrictions "deserve[d] little weight" in the historical analysis, 597 U.S. at 69, we side with the Second Circuit that it would be wrong to read *Bruen* as compelling "automatic rejection of any territorial laws and statutes…." *Antonyuk*, 120 F.4th at 1029. Territorial laws can carry weight when they were "consistent with" contemporaneous state laws, like this New Mexico law. *Id.*

[22] As with the Statute of Northampton, we agree with the Second Circuit that the Supreme Court's discussion of *English* in *Bruen* is not decisive to whether *English* is an analogue for place-based restrictions. *Antonyuk*, 120 F.4th at 1021 n.83.

confirmed laws as constitutional, that evidence ... suggests that the laws were constitutional....").

Several more laws show that just as crowded place laws existed long before Reconstruction, they persisted afterward. In 1879, New Orleans expanded its firearm prohibition to cover "any theatre, public hall, tavern, picnic ground, place for shows or exhibitions, house or other place of public entertainment or amusement." JEWELL'S DIGEST OF THE CITY ORDINANCES OF THE CITY OF NEW ORLEANS 1 (Edwin L. Jewell ed., 1882) art. 1; *see Wolford*, 116 F.4th at 987. From the 1880s through the turn of the century, the territories of Arizona, Montana, and Oklahoma affirmed the aforementioned state regulatory practices by adopting prohibitions on firearms in various public gathering spaces, like ballrooms. *Antonyuk*, 120 F.4th at 1020 (citing 1889 Ariz. Sess. Laws 16, 17, No. 13, §3; 1890 Okla. Terr. Stats. ch. 25, art. 47, §7); *Wolford*, 116 F.4th at 987 (describing an analogous 1903 Montana law).

On a similar record, the Second Circuit concluded that "the Nation not only tolerated the regulation of firearms in ... crowded spaces, but also found it aberrational that a state would be unable to regulate firearms ... in such spaces." *Antonyuk*, 120 F.4th at 1020–21. Said differently, a "high population density *in discrete, confined spaces* … has historically justified firearm restrictions." *Id.* at 1027 (emphasis added). The Ninth Circuit's analysis of various restrictions rested on a similar premise. *Wolford*, 116 F.4th at 986 ("[T]hese laws show a well-established tradition of prohibiting firearms at crowded places … [a]nd ... we are not aware of any question as to the constitutionality of those laws.").

The federal government, for its part, regulates concealed carry in transit: an airline passenger faces federal criminal

penalties for carrying a concealed firearm on board. 49 U.S.C. §46505. Congress first criminalized carrying weapons aboard aircraft in 1961, as commercial air travel began to play a greater role in our national life. *See* Act of Sept 5, 1961, Pub. L. No. 87-197, §l, 75 Stat 466, 466–67 (1961). We acknowledge that regulations concerning air transit are a more recent phenomenon. The Founders could not have anticipated the modern transit system, either as mass transit exists in Illinois or in air travel. The Supreme Court counseled that "dramatic technological changes may require a more nuanced approach" to our analysis of historical regulation. *Bruen*, 597 U.S. at 27. We note these more recent regulations here only to demonstrate an unbroken chain of regulations in crowded and confined spaces. And like the transport exception in the public transit firearm restriction at issue here, federal law allows a passenger to carry an unloaded firearm "in baggage not accessible to a passenger in flight if the air carrier was informed of the presence of the weapon." 49 U.S.C. §46505(d)(3). Illinois's approach with the public transit firearm restriction accords with Congress's choices in a similar context, supporting its lawfulness.

We agree with our sister circuits and hold that regulations in crowded and confined places are ensconced in our nation's history and tradition. As we see it, crowded spaces restrictions fall under the sensitive place doctrine. To clarify our terminology, any location where firearms can be banned is accurately described as a "sensitive place" for the sake of a Second Amendment inquiry. *Bruen* explicitly disclaims that it was listing all possible historical sensitive places. 597 U.S. at 30–31. The government's crowded spaces evidence helps us figure out if the label is appropriate by creating more analogues and further defining the characteristics and problems

that justify place-based firearm restrictions. As always, the converse is true too, and it is not enough to say that a rule addressing a crowded space is permissible merely because crowded spaces were historically subject to firearm regulations. *See id*. There must be a clear connection between the nature of the crowded space and the resulting problem of allowing firearms, which is best proved by analogue regulations that address comparable problems in similar spaces.

### 3. *The How and Why of Historical Regulations are Akin to Those of the Illinois Public Transit Restriction*

Against this backdrop of additional historical evidence, we turn to analogies. Analogizing between a legislative assembly and a CTA bus is no easy task. We could say both can suffer gridlock, yet that is clearly not relevant to our analysis. However, we are analogizing restrictions, not merely places. And because the high-level principle supporting historical sensitive place-regulations—temporary restrictions on arms-bearing in limited places with unique features—is familiar by now, we take the opportunity to be more specific.

Mindful of our marching orders from the Supreme Court, we start with the "how." *Bruen*, 597 U.S. at 29. Section 65(a)(8) impairs the right to carry a firearm only when an individual is within a particular space. Many of the restrictions scrutinized in the post-*Heller* era are categorical deprivations of the right to self-defense, such as the licensing regime struck down in *Bruen*, or the ongoing challenges to 18 U.S.C. §922(g)(1)'s prohibition of the possession of firearms by a convicted felon. *See, e.g., United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024); *Range v. Att'y Gen. United States*, 124 F.4th 218, 222 (3d Cir. 2024) (en banc); *United States v. Duarte*, 137 F.4th 743, 747

(9th Cir. 2025) (en banc); *Zherka v. Bondi*, 140 F.4th 68, 75 (2d Cir. 2025).

It is entirely possible to avoid Section 65(a)(8), as Plaintiffs currently do. And, when an individual decides the benefit of using public transit outweighs the burden on his right to carry, the trade-off is temporary.

Historical crowded place restrictions functioned in much the same way, and when those historical regulations differed, it was often due to earlier generations placing an even greater restriction on individuals carrying firearms. Americans in the Founding era, and through Reconstruction, accepted that their Second Amendment rights weakened in certain spaces. *Bruen*, 597 U.S. at 30. In fact, because firearms were often altogether prohibited in crowded spaces, the burden was greater than under Section 65(a)(8). An individual disarmed before and after the time spent at the crowded and confined ball or fandango of years past, until he returned to the place where his firearm was stored. Not true here. A concealed-carry licenseholder can keep his firearm with him as long as it is unloaded and secured during his time on public transit. *See* 720 ILCS 5/24-1(a)(4)(i)–(iii). Under Illinois's regulation, a citizen can step off the transit system, reassemble their firearm, and go about their day with no further infringement on their rights. When this aspect of the public transit firearm restriction's "how" differs from the past, it does so in a way that decreases the burden on Second Amendment rights. Undoubtedly the Second Amendment does not bar a state legislature from finding ways to regulate firearms in a manner less restrictive than relevant historical traditions.

There are more similarities in the "how." Aside from narrow exceptions for those entrusted with positions of

authority, historical crowded place restrictions did not distinguish between different groups of citizens (such as whether an individual had previously committed a crime). They did not draw distinctions based on the type of firearm. Section 65(a)(8) shares those traits.

"[T]he penalty—another relevant aspect of the burden— also fits within the regulatory tradition." *Rahimi*, 602 U.S. at 699. A violation of Section 65(a)(8) can be punished with imprisonment and a fine, *see* 430 ILCS 66/70(e), just like the penalties for violating historical crowded place rules. *See, e.g.,* An Ordinance Respecting Public Balls (1817) (providing for a five dollar fine); 1870 Tex. Gen. Laws 63, ch. 46, §1 (setting a fine of $50 to $500); 1870 Ga. Laws 421, No. 285, § 2 (punishing violations with a $20 to $50 fine and 10 to 20 days in jail). These punishments are another reminder that crowded place regulations developed from similar and earlier sensitive place regulations. *See, e.g.,* 1787 N.Y. Laws 344–45, ch. 1 (providing for "fine and imprisonment" for bearing arms at polling place); 1786 Va. Acts 35, ch. 49 (providing for imprisonment for bringing arms to courthouse). Even when historical sensitive and crowded place laws did not include imprisonment, the shared principle with Section 65(a)(8) is that a violation carries a legal consequence beyond getting kicked out and banned from a space. The "how" is a match.

Next, we evaluate the "why."[23] The actual security risk at any given crowded place, such as a social gathering, is sure to

---

[23] "We confess to some skepticism about any test that requires the court to divine legislative purpose from anything but the words that wound up in the statute." *Bevis*, 85 F.4th at 1200. As the Supreme Court has said many times outside of the Second Amendment context, "legislative history is not the law." *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523

vary from location to location and from day to day. What matters is that the features of those places will always lead to a different security calculus. We accordingly expect the government to show why the features of public transit create "particular problems" that situate Section 65(a)(8)'s restriction on arms bearing within our nation's tradition. *Rahimi*, 602 U.S. at 692.

Here, the government has explained how public transit's unique physical characteristics mean that firearms create similar problems there as in historically regulated crowded places. Public transit can be extremely crowded, with commuters standing shoulder to shoulder during peak times. Even when trains and buses are not densely packed with people, they are "discrete, confined spaces" where it would be difficult to avoid a person wielding a firearm. *Antonyuk*, 120 F.4th at 1027. The risk of wayward bullets striking an unintended innocent target is high. What's more, when vehicles are in motion, escape is generally impossible.

Also relevant: a brandished weapon or gunfire could distract, injure, or kill a train or bus driver, endangering the lives of everyone on the vehicle as well as anyone in its path. Public transit is even more confined than ballrooms of the past. Riders face not just plaster and wood in a large building, but rather tubes made primarily of metal. We are also mindful that first responders face a unique challenge in confronting an attack on crowded and confined metal tubes containing

---

(2018). Nor can we "peer inside legislators' skulls" to discern legislative intent. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 777 (2019). When we consider "why" a rule restricts firearms, therefore, we find it more illuminating to look at the text and what the rule does rather than the subjective intent of legislators. *Bevis,* 85 F.4th at 1200.

hundreds or even thousands of commuters. And that challenge becomes even more difficult when law enforcement has no way of knowing if an armed individual is an innocent civilian or the perpetrator of an attack.

These problems are inherent to the presence of firearms in the space. Framed in that perspective, "why" Section 65(a)(8) prohibits firearms in public transit is also why historical laws banned guns in crowded spaces, and why the federal government bans firearms on airplanes. Firearms are exceptionally dangerous and lethal in confined areas with a high density of people. As with the "how," the "why" is match. Just like the prototypical sensitive places laid out in *Bruen*—schools, courthouses and legislative assemblies—public transit today provides a function that is crucial to modern society.

Numerous historical comparators demonstrate why Section 65(a)(8) is within the nation's regulatory tradition. The government offers three ways of analogizing between the security problems recognized as permissible justifications in our history and the security problems posed by public transit: crowds, vulnerable populations, and government-controlled property.

First, the government says that public transit is "often crowded," like other sensitive places. *Wolford*, 116 F.4th at 1001. As we have observed throughout this opinion, Illinois's public transit system shares that characteristic with places subjected to arms regulations throughout our nation's history.

The government's second way of analogy is that children regularly take public transit. The record shows that all Chicago public schools distribute CTA fare cards that allow

students to take advantage of special student fares when using transit to attend classes. For many students, CTA serves as the functional equivalent of a school bus. To be sure, we are careful not to put too much weight on this similarity to schools. The Second Amendment does not vanish in the presence of children. But the fact that public transit serves the "vulnerable population[]" of children is a "why" that Section 65(a)(8) shares with historically permissible restrictions in schools. *Wolford*, 116 F.4th at 1001.

Third, public transit is owned and operated by the government. This is true of legislative assemblies, polling places, and courthouses.[24] It was generally not true of schools during the Founding era. Regardless, we find this similarity between public transit and most of the other sensitive places to be relevant. The Supreme Court has recognized that "government buildings" have maintained a longstanding tradition of firearm restriction, although we do not read *Bruen* to necessarily situate all government buildings within the category of widely-accepted sensitive places. *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). Either way, the government's power to regulate conduct and maintain order on its own property helps place laws like Section 65(a)(8) within our regulatory tradition.

Remember that millions of Illinois residents put their faith in the government to safely take them where they need to go. And those residents have decided, through their elected representatives, that forbidding firearms is a method to achieve this goal. The public transit firearm restriction is different

---

[24] Some polling places may be privately-operated locations that are temporarily in the control of the government during elections.

from bans on firearms in privately-owned places, where Illinois law might override an operator and a patron's agreement to allow firearms in an establishment.[25] The people, by way of the franchise, taxes, and fares, are both operator and patron of public transit. Section 65(a)(8) reflects their shared understanding of how to operate in the space of public transit. The Fourth Circuit has put it well: "Just as the Second Amendment protects the right of the people to keep and bear arms, the democratic process protects the right of the people to the blessings of self-government." *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 581 (4th Cir. 2025) (upholding federal ban on commercial sale of handguns to individuals under the age of 21).

That dynamic does not license a majority of the people to override the Second Amendment rights of a minority in places run by the government. "[I]ndividual and democratic rights do not extinguish one another in this important area...." *Id.* In fact, while Cook County has argued that we should apply a "government proprietor" framework that effectively withdraws firearm restrictions on government property from the *Bruen* framework in favor of a rational basis test, we decline to endorse that argument.[26] We consider government ownership at *Bruen*'s second step as a guidepost for locating

---

[25] As this opinion should make clear, the government can make such a collective security decision to deal with problems that are sufficiently analogous to those addressed in our historical tradition of regulation. What private establishments can be regulated under that test is a question for another day.

[26] It would be particularly inappropriate to recognize a "government proprietor" exception because none of the named Defendants are the proprietors of Illinois's public transit systems.

the public transit restriction within our nation's tradition. It is merely a relevant characteristic, neither necessary nor sufficient.

We stress that this analysis should not stretch beyond reason. Illinois cannot contend, for example, that the entire city of Chicago is a sensitive place because parts of that city can be crowded. *Bruen*, 597 U.S. at 29 ("[T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place....'"). Nor could it say the same for even those most crowded neighborhoods. The Second Amendment equally grants the right to bear arms to those who live in high density urban areas and those in rural communities. *See id.* What follows from that proposition is that the particular problem motivating a firearm ban in the Chicago Loop would be little more than the innate risk of firearms in society, which is inconsistent with the "balance struck by the founding generation...." *Id.* at 29 n.7.

By contrast, the Illinois public transit firearm restriction is consonant with a crucial limiting principle for permissible crowded and sensitive place regulations. Like sensitive and crowded place laws throughout our nation's history, the challenged statute only applies in discrete, easily defined locations. It bears repeating that "Firearms are dangerous" is a justification outside of our regulatory tradition. "Firearms are dangerous *in this kind of place*" can fall within that tradition.

A universal limiting principle is difficult to square with the regulation-specific inquiry that *Bruen* mandates. We are careful, however, to keep in mind that our decision today must not vest too much power in the state's hands. Doing so would disrupt the carefully drawn protections of the Bill of Rights. So we note that all we find necessary to decide in

rendering today's decision is that a regulation does not offend the Second Amendment because it is consistent with our historical tradition when it: 1) temporarily regulates the manner of carrying firearms; 2) in a crowded and confined space; 3) where that space is defined by a natural tendency to congregate people in greater density than the immediately adjacent areas; 4) that space furthers important societal interests; and 5) the presence of firearms in that space creates a heightened risk to maintaining public safety.

We stress that lower courts should not employ this summary of today's decision as a test in all Second Amendment challenges. "[C]ommon sense" informs the *Bruen* inquiry. *Rahimi*, 602 U.S. at 698. Consider nuclear power plants. We are not certain the principle set forth above would apply to all nuclear power plants. And, the Founding generation, for all their wisdom, had no opportunity to grasp that these facilities would one day exist, let alone decide whether to incorporate them into firearm laws. *See Wolford*, 116 F.4th at 980. In defending a ban on firearms at nuclear power plants, the government would fare best if it produced evidence of historical firearm restrictions at watermills, smelters or munitions stockpiles. Yet even in the absence of such evidence, courts would do *Bruen* no favors to pretend that it is impossible to identify the shared principle with earlier sensitive place restrictions. Is there something about a nuclear power plant that implies the general right to armed self-defense might temporarily dwindle there? The threat of radioactive cataclysm, we think, carries that implication.

Likewise, we emphasize that public transit did not exist until late in the 19th century. Even the post-Reconstruction-era laws cited herein predate mass, government-operated

transit. So, as we evaluate historical analogues, we must not lose sight of the modern target of Illinois's public transit firearm restriction: systems comprised of metal tubes traveling quickly, carrying hundreds of passengers at a time, and relied upon by millions for their basic transportation. The Founding and Reconstruction generations had no corollaries for a space where bullets will ricochet and kill innocents and first responders during a shooting, where the very nature of the space facilitates a quick escape by criminals, or where a terror attack could paralyze free movement throughout a city. *See id*. at 30 ("[T]he Second Amendment is [not] a regulatory straightjacket...."). In such circumstances, *Bruen* and *Rahimi*'s exhortations that we must identify a general principle, not a historical twin, carry greatest force.

Any attempt to impose a test of strict similarity between historical and current regulations would not only run afoul of binding precedent, *Rahimi*, 602 U.S. at 692, it would also jeopardize the carefully drawn balance of power between the federal government—including federal courts interpreting the U.S. Constitution—and the states. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) ("[A] healthy balance of power between the States and the Federal Government [reduces] the risk of tyranny and abuse from either front." (quoting *New York v. United States*, 505 U.S. 144, 181 (1992))). Part of the historical tradition of regulation is using the states as "laboratories for devising solutions to difficult legal problems." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quoting *Oregon v. Ice*, 555 U.S. 160, 171 (2009)). "The people of some states may find the arguments in favor of a lack of restrictions to be persuasive; the people of other states may prefer tighter restrictions." *Bevis*, 85 F.4th at 1203.

The virtue of our federal system is that citizens who find themselves on the losing end of legislative disputes in their state may vote with their feet and move to a jurisdiction where their views have prevailed. *See Bond v. United States*, 564 U.S. 211, 221 (2011) (explaining that federalism "makes government 'more responsive by putting the States in competition for a mobile citizenry.'" (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991))); *see also New York*, 505 U.S. at 181 ("[T]he Constitution divides authority between federal and state governments for the protection of individuals."). If the law is not to fossilize, *see Rahimi*, 602 U.S. at 691, there must remain room for a national dialogue where the people and their elected representatives try different solutions to their problems and compare the outcomes, so long as those policies are cut from the same cloth as historical regulations.

Are we saying that the public transit firearm restriction is constitutional? Yes. But we are not done, and our conclusion is informed by the next part of this decision, which is a continued study of the crowded spaces evidence in the record. The fabric of our national tradition will at times include regulations that do not strictly come from the government.

>    4.  *Illinois's Public Transit Firearm Restriction is Akin to Railroad Firearm Restrictions, As a Continued Thread of Crowded and Confined Spaces Regulation*

Here, we confront the government's contention that 19th-century railroad regulations are acceptable evidence for determining history and tradition. We tend to agree, once more aligning with the Ninth Circuit. In doing so, we emphasize that this evidence corroborates the expansive tradition of regulation in sensitive and crowded, confined places laid out

above, and removes any doubt that the public transit firearm restriction is within that tradition.

The Ninth Circuit concluded that "[a] ban on the carry of firearms on public transit almost certainly would be constitutionally permissible if the law allowed the carry of unloaded and secured firearms." *Wolford*, 116 F.4th at 1002. It "acknowledge[d] that public transit bears some features common to other sensitive places, such as government buildings and schools." *Id.* "Transit facilities are often crowded, they serve some vulnerable populations, and they are State-owned." *Id.* As we explain above, these shared features are a potent indication that firearm restrictions on public transit are constitutional, but the Ninth Circuit turned to a different analogue.

The Ninth Circuit primarily relied on the rules of private railroad operators in the 19th century, as situated in the historical tradition of crowded place regulations. *Id.* Plaintiffs' objection to this maneuver is easy to anticipate: these rules were not laws, so they are irrelevant to our analysis. This is an area for caution, but we disagree with Plaintiffs' wholesale rejection of the regulations' relevance. For one, the Supreme Court's decision in *Bruen* seemingly relied on private rules, in part, to support the conclusion that schools are a sensitive place.[27]

---

[27] *Bruen* acknowledges schools as a sensitive place and shortly thereafter cites to an amicus brief that describes several firearm restrictions at private universities. *Bruen*, 597 U.S. at 30. The Eleventh Circuit has followed this practice of consulting private university rules. *Nat'l Rifle Ass'n*, 133 F.4th at 1120.

For another, it is not quite right to say that late 19th-century railroads were strictly private entities. As the Ninth Circuit said:

> [i]n examining historical evidence, rules and regulations by private entities may inform the historical analysis, particularly where, as with train companies operating on the public right of way, the "private" entities were providing essentially a public service and were more properly characterized as mixed public-private entities.

*Wolford*, 116 F.4th at 1001. That characterization is endorsed by an array of more contemporary Supreme Court decisions. *Lake Shore & Mich. S. Ry. Co. v. Smith*, 173 U.S. 684, 690 (1899), *overruled on other grounds by Pa. R. Co. v. Towers*, 245 U.S. 6 (1917) ("A railroad company, although a quasi public corporation, and although it operates a public highway has, nevertheless, rights which the legislature cannot take away without a violation of the federal constitution....") (internal citation omitted); *Chicago, Burlington, & Quincy R. Co. v. Iowa*, 94 U.S. 155, 161 (1876) (stating that railroad companies are "given extraordinary powers, in order that they may the better serve the public" and are "engaged in a public employment affecting the public interest"); *Pine Grove Twp. v. Talcott*, 86 U.S. 666, 676 (1873) ("Though the [railroad] corporation was private, its work was public, as much so as if it were to be constructed by the State."). It also is supported in the record, where an expert report from Dr. Brennan Rivas explains that legislatures made special arrangements to authorize railway police to protect the peace of passengers in transit.

Because we are comfortable looking at these 19th-century rules, we proceed to the "how" and "why" comparisons. This part is straightforward. As described by Dr. Rivas and in *Wolford*, six railroad companies prohibited passengers from carrying "guns," or required guns to be kept "in cases and not loaded," or forced guns to be checked as baggage.[28] *Wolford*, 116 F.4th at 1001. This "how" is nearly identical to Section 65(a)(8).

So is the "why." Both the railroad rules and Section 65(a)(8) were "comparably justified," *Bruen*, 597 U.S. at 29, by a concern for public safety in confined, discrete, fast-moving vehicles.[29] *See, e.g.*, *Pa. R. Co. v. Langdon*, 92 Pa. 21, 27 (1879) ("The right of a railroad company to make reasonable rules for its own protection, and for the safety and convenience of passengers, has been repeatedly recognised."); *Poole v. N. Pacific R. Co.*, 16 Or. 261, 264 (1888) ("For its own safety and convenience, and that of the public, a railroad company may make reasonable rules and regulations for the management of its business, and the conduct of its passengers.").

Therefore, these rules—in coordination with the crowded and sensitive places analysis discussed above—show a historical tradition that bears a marked similarity with Section

---

[28] Plaintiffs cite an 1828 dictionary to assert that "gun" would have been understood to only refer to rifles, not handguns. This definition precedes the relevant regulations by decades and is not compelling evidence of their meaning.

[29] Plaintiffs implausibly suggest that railroads banned guns because they were unwieldly baggage and not because of public safety concerns. As the State explains in its reply brief, this is hard to square with exceptions allowing unloaded guns or guns in cases.

65(a)(8).[30] What we have here is "[t]he most compelling evidence ... of a consistent regulatory practice from ratification onward." *United States v. Carbajal-Flores*, 143 F.4th 877, 883 (7th Cir. 2025).

We could stop here. But *Bruen* and *Rahimi* convey a clear message that the individual right to self-defense is an important fixture of our Constitution. So we have a bit more to say about why Section 65(a)(8) is a permissible regulation.

> 5. *Illinois's Public Transit Firearm Restriction is Akin to Lawful Time, Place, and Manner Speech Restrictions in Sensitive Places*

We have one more reflection. We have been told to draw analogies to schools, legislative assemblies, polling places, and courthouses. *Bruen*, 597 U.S. at 29. First Amendment restrictions are ubiquitous in each location. *Tinker v. Des Moines*

---

[30] Beyond transit vehicles, Section 65(a)(8) also prohibits carrying firearms in "any building, real property, and parking area under the control of a public transportation facility...." The parties say almost nothing about this part of the law, which is tangential at best to Plaintiffs' claims. Plaintiffs brought this litigation because they desire to ride trains and buses while armed, not because they wish to carry firearms while walking through a train station or waiting at a bus stop. Regardless, we have no difficulty concluding that Illinois can also ban firearms in those transient spaces. Many of the same analogies apply, and it would be entirely impractical, both for government enforcement efforts and for Plaintiffs, if Section 65(a)(8) were to kick into effect the moment a person boards a transit vehicle. As for parking areas outside transit stations, they are also "a reasonable buffer zone such that firearms may be prohibited there." *Wolford*, 116 F.4th at 889. Plaintiffs, after all, are allowed to keep a firearm in their vehicles so long as they secure it before exiting. We lastly note that Illinois bans firearms in parking areas adjacent to many different locations, *see generally* 430 ILCS 66/65, so we leave the application of the sensitive places doctrine to other parking areas for a later day.

*Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 513 (1969) (permitting reg-ulation of disruptive speech in schools); *United States v. Nassif*, 97 F.4th 968, 976 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 552 (2024) (allowing Congress to prohibit speech and demonstra-tions within the U.S. Capitol); *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12–13 (2018) (providing that polling places are "government-controlled property set aside for the sole pur-pose of voting" where speech is restricted); *Braun v. Baldwin*, 346 F.3d 761, 764 (7th Cir. 2003) (limiting speech that encour-aged jury nullification in courthouses).

On top of that, in *Anderson v. Milwaukee County*, 433 F.3d at 980, we upheld a restriction that prohibited passengers from distributing literature while on public buses. We high-lighted a few reasons why buses were a space where free speech rights diminished. "[T]he bus is a governmentally con-trolled forum...." *Id.* at 979. "Bus passengers are a captive au-dience." *Id.* at 980. "It is reasonable for the bus company to attempt to ensure their comfort." *Id.* "Furthermore, the bus company has an interest in passenger safety." *Id.* "Given the nature of the forum, a ban on the distribution of literature on buses passes constitutional muster." *Id.*

First Amendment cases, including *Anderson*, involve the means-ends scrutiny that *Bruen* prohibits, and we do not re-peat that inquiry. (Even if we could, it would be substantively different because the right to speak is not the same as the right to carry a firearm.) At the same time, we doubt that the Su-preme Court intended to completely divorce the First and Second Amendments, especially when we look at restrictions that are defined solely by reference to physical location. The Court, indeed, has made direct comparison between the Amendments. *See Bruen*, 597 U.S. at 24 ("This Second

Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms.").

The government may lawfully restrict speech in the sensitive places identified in *Bruen*. That common feature of these places is important in a constitutional sense. And similar speech limits on public transit align the public transit firearm restriction with the principle that where one constitutional right diminishes, so might another.

Ultimately, under *Bruen*'s test, we are not concerned with whether the government has demonstrated a compelling interest in regulating firearms on public transit. 597 U.S. at 29 n.7. Maybe Illinois has made a good policy choice, maybe not. Our concern is whether the law aligns with the nation's tradition. We hold that 430 ILCS 66/65(a)(8) is constitutional because it comports with regulatory principles that originated in the Founding era and continue to the present.[31]

### III. Conclusion

The district court in this case noted that it had "trouble applying what the Supreme Court said in *Heller* and *Bruen*" and

---

[31] The section of the Concealed Carry Act that bans firearms on public transit also forbids firearms in many other areas, including at any building under the control of the executive and legislative branches of government, childcare facilities, hospitals, establishments that earn a majority of their revenue from serving alcohol, public gatherings that require the issuance of a permit, parks, stadiums, libraries, airports, amusement parks, zoos, museums, nuclear facilities, and more. *See generally* 430 ILCS 66/65. What we have already said about daycares and nuclear power plants is dicta, and we avoid writing more. We can only refer future courts to the reasoning employed in our review of the public transit restriction.

was "doing the best" it could. Although we reverse, we certainly understand the district court's reasoning and how it reached its holding. Similarly, the Ninth Circuit finished its opinion in *Wolford* with commentary that the "lack of an apparent logical connection among the sensitive places is hard to explain in ordinary terms" and that the "seemingly arbitrary nature of Second Amendment rulings undoubtedly will inspire further litigation as state and local jurisdictions attempt to legislate within constitutional bounds." 116 F.4th at 1003.

Unsettled areas of the law are nothing new. We cannot yet know if these are legal growing pains that will subside with age, or if they signify a malady in need of a cure. And, for all that lower courts may think, our job is to apply binding precedent. If the current test proves unworkable, altering it is the sole province of the Supreme Court.

*Bruen* and *Rahimi* leave some open questions. One challenge, as we have said, is how to resolve conflicting evidence between different eras. Another is the stringency of the government's burden: how many historical analogues are needed to sustain a law? *See, e.g., Bruen*, 597 U.S. at 46 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."). Relatedly, how do we know that the absence of historical regulation means that modern regulation is unconstitutional, rather than a reflection of different but permissible policy choices? Phrased differently, what evidence tells us when "founding-era legislatures maximally exercised their power to regulate...."? *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring). And with what "level of generality" are we to view the similarity between a modern regulation and its historical analogue? *Id.* at 740. Perhaps in

another case we will be called upon to work within *Bruen* to resolve these questions. We need not address those issues here because no matter the answers, Section 65(a)(8) is well within our nation's history and tradition of firearm regulation.

We REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

ST. EVE, *Circuit Judge*, concurring. I agree with and join the majority opinion in full. As the majority opinion explains, the Plaintiffs here have standing (and we jurisdiction) because the threat of criminal prosecution for engaging in constitutionally protected activity is an injury-in-fact that a court may redress through injunctive or declaratory relief. In such circumstances, a separate, unchallenged law also barring the activity does not defeat redressability. *See ante*, at 10–11; *Reps. Comm. for Freedom of the Press v. Rokita*, --- F.4th ----, No. 24-2927, 2025 WL 2218472, at *4 (7th Cir. Aug. 5, 2025); *see also Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024).

I write separately to highlight a difficult jurisdictional question that today's opinion prudently reserves for a future case: how to assess redressability where a plaintiff defines her injury as the inability to engage in protected activity—not the threat of prosecution for doing so—and an unchallenged law also prohibits that precise activity.

## I.

To invoke the judicial power of the federal courts, litigants must have standing. *California v. Texas*, 593 U.S. 659, 668 (2021). One element of the irreducible constitutional minimum of standing is redressability, which demands that it be "'likely,' as opposed to merely 'speculative,'" that a favorable decision will redress the plaintiff's injuries. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976)).

The redressability requirement serves two functions. It prevents the issuance of advisory opinions, and it generally ensures "there is a sufficient 'relationship between the judicial relief requested and the injury suffered.'" *Diamond Alt. Energy,*

*LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (quoting *California v. Texas*, 593 U.S. at 671). Yet what constitutes a "sufficient" relationship is the subject of long-running debates, at least two of which surface where a plaintiff challenges only a subset of the laws precluding her desired conduct.

**A.**

The first debate asks how close the relationship between the plaintiff's alleged injury and the requested relief must be. If it must be "likely" that a favorable decision will result in redress, how probable is "likely"? Would a fifty percent chance suffice? A seventy-five percent chance? *See* F. Andrew Hessick, *Probabilistic Standing*, 106 Nw. U. L. Rev. 55, 66–68 (2012); 13A Wright & Miller's Federal Practice & Procedure § 3531.6 (3d ed. 2025) (describing redressability determinations as "a matter of uncertain prediction"). Furthermore, should courts consider the likelihood of redress in relative or absolute terms? If there are multiple independent barriers to redress, would removing one suffice, or must the relief sought lift all barriers? *Compare Utah v. Evans*, 536 U.S. 452, 464 (2002) (requiring only that judicial relief "increase … the likelihood" of redress), *with Lujan*, 504 U.S. at 561 (requiring judicial relief actually make redress, itself, "likely").

A recent decision from the Supreme Court illustrates conflicting trends in the law: *Gutierrez v. Saenz*, 145 S. Ct. 2258 (2025). In *Gutierrez*, a prisoner sought a declaratory judgment that state post-conviction procedures violated his due process rights by denying him access to DNA testing. The Fifth Circuit held that he lacked standing because a favorable decision would not entitle him to testing; his prosecutor could deny him access to the evidence on other grounds. *Id.* at 2262.

The Supreme Court reversed, reasoning that the Fifth Circuit erred "in transforming the redressability inquiry into a guess as to whether a favorable court decision will in fact ultimately cause the prosecutor to turn over the evidence." *Id.* at 2268. A declaratory judgment would remove an allegedly unconstitutional barrier between the plaintiff and the requested testing—and that was sufficient for redressability. *Id.*; *cf. Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (acknowledging that "a single dollar often cannot provide full redress," but holding that "a partial remedy" may satisfy redressability); *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (finding redressability satisfied where motor vehicle regulations would not "*reverse* global warming" but would eliminate some greenhouse gas emissions contributing to it); *Larson v. Valente*, 456 U.S. 228, 243 (1982) (holding that the removal of a rule requiring the plaintiffs to register and report on their activities sufficed for redressability even where another rule could require the same).

Several Justices dissented in *Gutierrez*, citing *Lujan*. *Gutierrez*, 145 S. Ct. at 2284 (Alito, J., dissenting) (protesting that the majority "makes a hash of redressability"); *see also id.* at 2269 (Barrett, J., concurring in the judgment). And in a second case from the same term, the Court asserted a more stringent formulation of redressability, requiring plaintiffs to show that judicial relief will cause "predictable" responses that will make redress of their injuries likely, in absolute terms. *See Diamond Alt. Energy*, 145 S. Ct. at 2134; *see also Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024); *Simon*, 426 U.S. at 38.

Reconciling these two lines of cases presents a challenge for federal courts. But what it means for a favorable decision

to "likely" redress a plaintiff's injury is not the only unsettled area of the redressability doctrine.

**B.**

A second debate concerns the *mechanism* of constitutionally permissible redress. Where a favorable decision may redress a plaintiff's injury, must that redress run through the court's judgment, or may it stem from the persuasive power and likely effect of a favorable, reasoned opinion?

In *Haaland v. Brackeen*, the Supreme Court adopted the former view:

> Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power. … It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability.

599 U.S. 255, 294 (2023) (citation modified). So where plaintiffs seek declaratory relief, they must establish that the "preclusive effect" of a favorable judgment would likely redress their alleged injury, because "[w]ithout preclusive effect, a declaratory judgment is little more than an advisory opinion." *Id.* at 293–294.

Taken at its fullest, *Brackeen*'s statement that redress must derive from the power of a court's judgment constitutes a change in the redressability doctrine. *See* William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 179 (2023) (observing that *Brackeen*'s conception of redressability "is not the conception that has always held sway

in the past sixty years"). And it is a change with significant impact on how we assess redressability where a plaintiff challenges only some of the laws barring her desired conduct.

To understand that impact, I must turn to an earlier case from the Supreme Court, *Renne v. Geary*, 501 U.S. 312 (1991). In *Renne*, the plaintiffs challenged a law prohibiting political endorsements in nonpartisan elections, alleging it violated their First Amendment rights. *Id.* at 314–15. In dicta, the Court found "reason to doubt" the redressability of the alleged injury because an unchallenged statute also barred the plaintiffs' desired conduct, and "invalidation of [the challenged statute] may not impugn the validity" of the unchallenged one. *Id.* at 319. Implied, then, was the assumption that if invalidation *would* impugn the other law, meaning the same constitutional reasoning applied to both, the plaintiff's injury could be redressable. Put more directly, *Renne* appears to have assumed that redress could stem from the reasoning of an opinion, not solely from a court's judgment.

After *Renne*, we and several of our sister circuits assessed whether an unchallenged law barred redressability by asking whether the "fates" of the laws were "intertwined." *Hollis v. Lynch*, 827 F.3d 436, 442 (5th Cir. 2016), *abrogated on other grounds by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024); *see also Harp Advert. Ill., Inc. v. Vill. of Chi. Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993) (finding no redressability where a "valid" unchallenged law also precluded the plaintiff's desired activity); *Maldonado v. Morales*, 556 F.3d 1037, 1043–44 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 1139 (2010) (reasoning that the plaintiff had standing because a favorable ruling "would likely allow him to surmount" an unchallenged, "similarly-worded" law).

It seems questionable whether these precedents survive *Brackeen*, leaving unsettled how we ought to approach redressability analyses where an unchallenged law also bars the plaintiff's desired conduct.

## II.

This case illustrates the challenges federal courts face when navigating these crosscurrents and new developments in redressability law.

The Plaintiffs here alleged that the threat of prosecution under 430 ILCS 66/70(e) for violating the transit restriction, 430 ILCS 66/65(a)(8), was an injury-in-fact redressable through declaratory relief. I agree. The Plaintiffs further alleged, however, that their inability to bear guns on the CTA and Metra was itself an injury-in-fact.

To assess the redressability of this second injury, we face an early fork in the road. If we need not interrogate "whether a favorable court decision will in fact" make it more likely that the Plaintiffs can bear concealed weapons on public transit, our analysis may be brief. *See Gutierrez*, 145 S. Ct. at 2268. A favorable decision would remove a barrier to the Plaintiffs' desired conduct and thus satisfy Article III's redressability requirement. *See id.* But under a more stringent application of the Court's redressability precedent, our analysis must continue. *See Diamond Alt. Energy*, 145 S. Ct. at 2133; *Renne*, 501 U.S. at 319.

We would next ask whether other, unchallenged laws also bar concealed weapons on public transit. By my count, the defendants and amici propose five: a CTA ordinance, a Metra rule, two provisions of Illinois's unlawful possession of weapons statute, and a separate provision of Illinois's Firearm

Concealed Carry Act. *See* CTA Ord. No. 016-110 § 1 (28) (2016); Passenger Code of Conduct, Metra, §§ III(I), IV(H); 720 ILCS 5/24-1(a)(4), (10); 430 ILCS 66/65(a)(5).[1]

Prior to *Brackeen*, our scrutiny of these unchallenged laws may have been limited. Take CTA's and Metra's rules restricting weapons on their buses and trains. These rules largely mirror Illinois's transit restriction. So their fates are probably "intertwined"; a declaratory judgment that the transit restriction unconstitutionally infringed the Second Amendment would likely prove persuasive in a subsequent suit challenging the local laws. *See Hollis*, 827 F.3d at 442 (reasoning that the plaintiffs had standing because if the challenged federal firearm law was unconstitutional, the overlapping and unchallenged state law was likely also unconstitutional).

But *Brackeen* instructs that redressability must stem from the preclusive power of a court's judgment. And to have preclusive effect, a judgment must both bind the same parties and resolve the same issues, actually and necessarily litigated in the first suit. *See Smith v. Bayer Corp.*, 564 U.S. 299, 307–08 (2011); *see also* 18 Wright & Miller, supra, § 4417. Here, it is unclear whether a judgment against Illinois and Cook County

---

[1] Whether each law independently precludes concealed carry on public transit is a difficult question of state law that I (and the majority opinion) do not purport to reach today. For example, Section 5/24-2(a-5) of Illinois's unlawful possession of weapons statute seems to exempt concealed carry license holders from prosecution under 5/24-1(a)(4) and (10), even as (a)(4) and (10), as well as other provisions of Illinois law, appear to evince contrary intent. S*ee, e.g.*, 430 ILCS 66/70(f). And the cited CTA ordinance does not apply to people "authorized" to carry weapons by 5/24-2, where 5/24-2 exempts concealed carry license holders from prosecution under provisions of 5/24-1 but does not "authorize" conduct.

declaring the transit restriction unconstitutional would meet either requirement.

Begin with the parties. While Illinois may enforce transit system rules through its trespassing statute, 720 ILCS 5/21-3, the CTA and Metra, too, may enforce their own regulations. *See* 70 ILCS 3605/27; 70 ILCS 3615/3B.09c. Yet neither the CTA nor Metra are parties to this suit. A favorable decision would not bind them, and declaratory relief thus may not redress the Plaintiffs' injuries. Indeed, the Tenth Circuit reached this conclusion in a very similar suit. *See We the Patriots v. Grisham, Inc.*, 119 F.4th 1253, 1259–61 (10th Cir. 2024) (holding the plaintiffs lacked standing to challenge a state executive order barring firearms from public parks where county and city ordinances also barred firearms and the plaintiffs only sued the state).

The issues raised in a suit challenging CTA and Metra's regulations may prove distinct, too. For example, Cook County asserts that *Bruen* does not apply to the transit restriction because the law is exempt from scrutiny under the government-as-proprietor doctrine. *See Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 622 (7th Cir. 2011) ("Where the state acts as a proprietor … its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."); *Wolford v. Lopez*, 116 F.4th 959, 970–71 (9th Cir. 2024) (hypothesizing that a government bank could exclude those bearing arms as an exercise of its proprietary rights). Alternatively, Cook County argues that the transit restriction is a constitutional condition on government funding. *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

The majority correctly rejects both theories. Illinois, which enacted the transit restriction, is not the proprietor of the CTA

or Metra. The State delegated that role to the CTA and Metra, themselves. *See* 70 ILCS 3605/6 (vesting the "power to acquire, construct, own, operate and maintain for public service a transportation system in the metropolitan area of Cook County" with the CTA); 70 ILCS 3615/3B.09c (assigning the power to "make rules and regulations proper or necessary to regulate the use, operation, and maintenance" of its property and facilities to Metra's Chief of Police). Moreover, criminal laws, like the transit restriction, are necessarily exercises of sovereign rights, not proprietary ones. So the government-as-proprietor doctrine likely does not apply. Analogously, because the transit restriction relies on Illinois's police power, not its spending power, the unconstitutional conditions doctrine is likely also inapposite.

We therefore do not need to resolve the interplay between *Bruen,* the government-as-proprietor doctrine, and the unconstitutional conditions doctrine in this case. These issues are not "necessarily raised" and "actually litigated." A suit challenging CTA and Metra's rules, on the other hand, may implicate them. It seems unlikely, then, that a favorable judgment here would preclude the CTA and Metra from enforcing or defending their rules in a subsequent dispute with the Plaintiffs. And without this preclusive power, *Brackeen* instructs us that the Plaintiffs lack standing.

One final observation. Even outside the government-as-proprietor and unconstitutional conditions context, Second Amendment plaintiffs seem especially likely to encounter standing challenges under a more stringent conception of redressability. Our system of cooperative federalism has produced an array of overlapping federal, state, and local laws regulating firearms. And *Bruen* demands a fact-intensive

analysis of "how" and "why" each challenged law burdens the Second Amendment right. Against this backdrop, it seems improbable that challenges to two different laws would raise the exact same issues. So a judgment declaring one law unconstitutional would not preclude enforcement of the other.

### III.

The federal courts' approach to redressability is in flux. New developments have unsettled how we assess standing when overlapping laws bar activities the plaintiff alleges are constitutionally protected. Absent further guidance, we must proceed cautiously.